NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
HANSEL S. TORRIERO,                           :
                                              :
       Plaintiff,                             :   Civ. No. 03-5155 (AET)
                                              :
    v.                                      :
                                              :   MEMORANDUM OPINION
SECURITY OFFICERS, POLICE &                   :
GUARDS UNION (SOP&GU)                         :
LOCAL 1536, et al.,                           :
                                              :
       Defendants.                            :
_____:

THOMPSON, U.S.D.J.

I.    Introduction

    This matter comes before the Court upon Plaintiff Hansel Torriero's complaint alleging that he was denied a full-time position as a court security officer ("CSO") in Camden, New Jersey, because of improper actions taken by his union, Defendant Security Officers, Police & Guards Union Local 1536 (the "Union"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185. The parties proceeded to trial only on the duty of fair representation claim in Count I of the amended complaint, with the Union as the sole remaining defendant. The Court conducted a non-jury trial on December 19, 2005, and received and considered trial memoranda submitted by the parties. Pursuant to Fed. R. Civ. P. 52(a), the Court issues the following findings of fact and conclusions of law.

II.   Findings of Fact

   A.   Background

The United States Marshals Service ("USMS") has the responsibility of ensuring the safety of the federal courts and court employees. To fulfill this responsibility in the District of New Jersey, the USMS contracts with MVM Staffing and Security Services, Inc. ("MVM"), a private company, to provide court security services. (Pl. Ex. 6.) Under the USMS contract, MVM directly employs CSOs to work in the three federal courthouses in the District of New Jersey, which are located in Camden, Trenton, and Newark.

Defendant Union is the exclusive bargaining representative for the CSOs in the District of New Jersey. It negotiates the terms of the collective bargaining agreement ("CBA") with MVM for all full-time and part-time CSOs. (Pl. Ex. 5.) The CBA regulates such things as sick leave, vacations, wages, and holidays. The CBA may be amended in writing with the mutual agreement of MVM and the Union. (Pl. Ex. 5, CBA art. XXIX at 21.)

Vacant CSO positions are filled by seniority. (See Pl. Ex. 5, CBA art. VIII, § 1 at 5 ("When a vacancy occurs, [MVM] will fill the position with the most senior Employee who has applied for the position in writing . . . .").) Article VI, section 2 of the CBA indicates that "[p]art-time employees will have seniority only among other part-time employees. Any part-time employee who becomes a full-time employee will be placed on the seniority list for full-time employees on the date they became a full-time employee . . . ." (Pl. Ex. 5, CBA art. VI § 2 at 3.) Seniority is not given to new hires until they have completed a probationary period. (Pl. Ex. 5, CBA art. V at 3.)

The Union uses the constitution and by-laws of the International Security Officers Police

& Guards Union. The by-laws provide for a secret ballot for election to positions on the Union's executive board. They do not specifically address how to hold a vote among union members to confirm an interpretation of the CBA. (Pl. Ex. 21 art. XI at 15-16.)

  B. The Job Posting in Camden for a Full-Time CSO

On or about October 21, 2002, Plaintiff began working for MVM as a full-time CSO at the federal courthouse in Newark, New Jersey. Plaintiff had previously worked as a part-time CSO, first in Newark, then in Trenton, and finally in Camden. By leaving his part-time position in Camden to take the full-time position in Newark, Plaintiff believed that he would gain more seniority, which would give him a better chance to return as a full-time CSO in Camden when a position opened up there.

On July 1, 2003, MVM circulated a notice of a job posting for a full-time CSO position in the Camden courthouse. (Pl. Ex. 7.) Plaintiff indicated that he was interested in the position by signing the job posting on July 2, 2003 and also by writing a letter on July 9, 2003 to Mr. Carl Piro, the MVM site supervisor for the District of New Jersey who was responsible for ensuring that the position was filled. Based on his understanding that full-time seniority trumped part-time seniority on a district-wide basis, Mr. Piro told Plaintiff that he would get the position.

The job posting for the Camden position, however, was subsequently suspended under the contemplation of the USMS that the position might be transferred to the Trenton courthouse. On August 13, 2003, the USMS reinstated the Camden position, and a new job posting was circulated. On that same date, Plaintiff again indicated his interest in the position by signing the job posting and writing a letter to Mr. Piro. Shortly thereafter, the Union took a vote to confirm its understanding of the procedure used to fill vacant full-time CSO positions in the District of

New Jersey.

    C.    <u>Union Vote on the Interpretation of Article VI, Section 2 of the CBA</u>

In August 2003, Mr. Joseph Laffey, the Union President, spoke with Mr. Edward Hayes, Jr., the Senior Vice-President and Legal Counsel to MVM, concerning how seniority was used to fill vacant CSO positions. Mr. Hayes prepared a draft letter which was "intended to confirm various conversations between SOPGU Local 1536 and MVM, Inc., concerning the procedure for filling open full-time court security officer positions in the U.S. District Court in New Jersey." (Pl. Ex. 1.) In pertinent part, the draft letter confirmed the following understandings between the Union and MVM:

> 1. The Union affirms that it would be consistent with past practice within the Third Circuit in New Jersey for a CSO position within the Circuit to be filled first by building seniority where the opening occurs.
>
> 2. The Union avers that Article VI, Section 2, of the current CBA between SOPGU and MVM, to wit "Part-time employees will have seniority only among other part-time employees," pertains to seniority for vacation schedules, overtime, etc., and not to filling vacant CSO positions.
>
> 3. The Union and a majority of its members agree with and support the MVM representation that it will rely upon the understandings in paragraphs 1 and 2 above to utilize site seniority in filling a current vacancy in New Jersey and the Union and a majority of its members agree with and support this decision.
>
> 4. Further, the Union will indicate its concurrence with MVM's decision in paragraph 3 above if said decision is opposed by any party.

(Pl. Ex. 1). In essence, the draft letter indicated that vacant CSO positions would be filled by site seniority, and not by district-wide seniority. Mr. Hayes faxed the draft letter to Mr. Laffey at

11:48 A.M. on Friday, August 15, 2003.  Mr. Laffey proceeded to circulate the draft letter in Camden, Trenton, and Newark for approval by the union members.

      Because Mr. Laffey was a lead CSO in Camden at the time, he posted the draft letter in the Camden CSO lunch room along with a seniority list, which listed the names of all the CSOs in Camden, on August 15, 2003.  He posted another copy of the draft letter in the locker room.  When CSOs arrived for duty, Mr. Laffey informed them of the copies of the draft letter and asked them to sign yes or no on the seniority list to indicate their vote.  Of the twenty-six CSOs named on the Camden seniority list, one was deceased, and the other twenty-five voted yes and initialed their votes to indicate their agreement with the draft letter.  (Pl. Ex. 2.)  Mr. Laffey collected the results of the vote in Camden on Monday, August 18, 2003.

      Mr. Laffey faxed the draft letter to Trenton on August 15, 2003, and asked Mr. Al Juliano, the business agent for the Union and a CSO in Trenton, to oversee the vote in Trenton.  On that same day, Mr. Juliano posted the draft letter on the bulletin board in the CSO ready room.  He sat at a table in the ready room with the Trenton seniority list and informed the CSOs of the vote as they arrived for duty and also during their breaks.  Many of the Trenton CSOs asked Mr. Juliano to mark down "yes" responses for them as they prepared for duty.  All eighteen of them voted to approve the draft letter, and signed their initials on the seniority list by their votes. (Pl. Ex. 4.)  Mr. Juliano testified that the vote was completed on August 15, 2003.  Mr. Juliano faxed the seniority list with the Trenton CSOs' votes and initials  to Mr. Laffey on August 19, 2003.

      Mr. Laffey also faxed the draft letter to Newark on August 15, 2003.  Because there was no union representative in Newark, Mr. Laffey asked Mr. Robert Pizzi, a former union

representative and a CSO in Newark, to post up the draft letter along with the seniority list for the Newark CSOs.  Mr. Pizzi wrote "Read #1 [the draft letter] and vote yes or no next to your name" on the top of the seniority list and posted the documents on the bulletin board in the CSO break room.  Mr. Laffey testified that he called Mr. Pizzi on August 18, 2003 to ask if the vote had been completed in Newark as, by that time, both Camden and Trenton had finished voting.  Mr. Pizzi replied that the vote was not done, and Mr. Laffey told him to give it another day.  Mr. Pizzi removed the documents from the bulletin board on August 19, 2003, and faxed the results to Mr. Laffey on August 21, 2003.  Of the thirty-five CSOs in Newark, one voted yes, six voted no, and the remaining twenty-eight CSOs did not vote. (Pl. Ex. 3.)

While Plaintiff initially wrote "no" next to his name on the seniority list, he ultimately reconsidered his vote because he concluded that he did not understand what the documents meant.  Two other CSOs from Newark testified that they did not vote because the seniority list had been removed before they could vote.  The first of the two, Mr. Joseph Pannachio, did not vote because he did not have access to the CBA to compare it with the language of the draft letter before the list was taken down.  The other, Mr. Thomas Wagner, saw the papers posted on the bulletin board, but delayed voting because he did not understand what the vote was about.

In total, forty-four of the seventy-eight CSOs in the District of New Jersey voted to approve the draft letter.  Mr. Laffey and Mr. Hayes signed a finalized version of the letter, which was printed on MVM letterhead and dated August 18, 2003.  (Pl. Ex. 11.)  On August 27, 2003, Mr. Piro circulated a memo to all CSOs in the District of New Jersey announcing that Mr. Richard Zacamy would fill the full-time CSO position in Camden.  Mr. Zacamy had been a part-time CSO in Camden, and was given the full-time position because he had the most seniority in

Camden.

    D.    <u>Past Practice for Filling CSO Vacancies</u>

Testimony at trial revealed conflicting views concerning the past practice used to fill vacant CSO positions in the District of New Jersey. Mr. Piro, the MVM site supervisor for the District of New Jersey, testified that his understanding was that the past practice was to fill positions by measuring seniority among all the CSOs within the district, and that full-time seniority trumped part-time seniority anywhere in the district. Mr. Laffey, the Union president, on the other hand, testified that the past practice of MVM was to fill positions using in-house seniority, based on how long the CSO had been at his or her particular work site.

Witnesses also testified about past transfers where CSOs had moved between work sites. None of those past transfers established a practice of either site seniority or district-wide seniority. For example, prior to the events in the instant case, a full-time CSO from Camden was granted a transfer to a full-time position in Trenton where no in-house part-time CSO had applied for the job. In addition, several full-time CSOs from other districts had transferred to part-time positions in the District of New Jersey. Because they had originally held positions outside the district, they did not have seniority either at the work site or in the district. Further, one full-time CSO from Newark had transferred to a part-time position in Trenton because he lived closer to Trenton than to Newark and had a sick family member at home. The evidence did not indicate one way or another whether the CSO took the position under a site seniority policy.

No witness was able to recall any past situations similar to the one at hand, where a full-time CSO applied for a full-time position at a different site where a part-time CSO who had more in-house seniority at that site also applied for the position. Moreover, Plaintiff's own transfer

between Camden and Newark did not help to establish any relevant past practice. As a part-time CSO in Camden, Plaintiff had previously applied to transfer to a position in Newark as a full-time CSO. Plaintiff was given the position even though a few part-time Newark CSOs had also applied for the position. However, the Newark applicants did not have any seniority because they had not completed their probationary periods. Thus, this transfer also did not establish a practice of either site seniority or district-wide seniority.

III.     Conclusions of Law

The issue before this Court is whether the Union breached its duty of fair representation to Plaintiff. Because a union serves as "the exclusive bargaining agent for [all employees in a collective bargaining unit], it has a duty to provide fair representation in the negotiation, administration, and enforcement of the collective bargaining agreement." Findley v. Jones Motor Freight, Div. Allegheny Corp., 639 F.2d 953, 957 (3d Cir. 1981); see also 29 U.S.C. §§ 158(b), 411. This duty is akin to the "duty owed by . . . fiduciaries to their beneficiaries." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 74 (1991). The duty requires that a union "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967) (citing Humphrey v. Moore, 375 U.S. 335, 342 (1964)). A union breaches the duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith." Id. at 190.

A union is not required to hold a vote on matters of contract interpretation or contract amendment, unless there is an express provision to the contrary in the CBA or the union's governing documents. See Ekas v. Carling Nat'l Breweries, Inc., 602 F.2d 664, 666-67 (4th Cir. 1979) (citing Ford Motor Co. v. Huffman, 345 U.S. 330, 342-43 (1953)). A union, however, is

wise to hold a ratification vote regarding changes to a CBA to avoid "subjecting [its members] to the disadvantages of a contract whose acceptance they could have prevented, and . . . depriving them . . . of the benefits of a contract whose acceptance they could have ensured." Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local No. 310 v. N.L.R.B., 587 F.2d 1176, 1182 (D.C. Cir. 1978). In accordance with its duty of fair representation, once a union has decided to gain membership/y approval of an amendment to (or its interpretation of a provision of) the CBA, it "must accord the opportunity to vote equally to all unit members." Id.

Here, the Union characterizes the draft letter as an interpretation of or an amendment to the CBA. As there is no express requirement for a vote to approve an interpretation of or an amendment to the CBA, the Union was not required to circulate the draft letter to its membership for approval. However, because the Union chose to hold a vote, the Court concludes that the Union was bound to provide each of its members with an equal opportunity to vote under its duty of fair representation. See id.

The Union's by-laws do not provide any helpful instruction in this regard. Although the by-laws provide for a secret ballot for board elections, they do not indicate what method of voting should to be used to approve a written interpretation of or amendment to the CBA. While a union is given "[a] wide range of reasonableness . . . [to] serv[e] the unit it represents, [its actions are] subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co., 345 U.S. at 338. Accordingly, even where there are no formal procedures to guide the voting process, a union still must fulfill its obligation to provide an equal opportunity to vote by at least ensuring that the opportunity to vote is meaningful, and not just a "mere naked right to cast a ballot." Carothers v. McCarthy, 705 F. Supp. 687, 691, 693 (D.D.C.

1989) (citing Bunz v. Moving Picture Mach. Operators' Protective Union Local 224, 567 F.2d 1117, 1121-22 (D.C. Cir. 1977)); see also Blanchard v. Johnson, 532 F.2d 1074, 1078-79 (6th Cir. 1976); Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties Carpenters Dist. Council of the United Bhd. of Carpenters & Joiners of Am., 423 F.2d 515, 521 (6th Cir. 1970).

This Court is "not unfettered in its determination of what constitutes . . . a 'meaningful vote.'" Blanchard, 532 F.2d at 1078. Put simply, a meaningful vote is a vote where voters are treated fairly and equally and are not discriminated against in their right to vote. See id. In the past, for example, other courts have found that the right to a meaningful vote was denied where misleading language was used in a ballot, Young v. Hayes, 195 F. Supp. 911, 916 (D.D.C. 1961); where a referendum was unfairly presented as a package proposition, Sertic, 423 F.2d at 520; and where voters were not given the information necessary to cast an informed vote, Carothers, 705 F. Supp. at 692. A meaningful vote can be subjected to reasonable rules and regulations. Blanchard, 532 F.2d at 1078. As noted above, however, the vote at issue in this case was not guided by any particular rules and regulations.

The Court finds the Young case instructive. In Young, introductory statements in the ballot misleadingly indicated that proposed amendments to the union's constitution were "necessary changes" under the law. 195 F. Supp. at 913. The Young court found that language in the ballot "may very well have been confusing and misleading . . . and imparted to the [union members] . . . an almost 'forced choice' method of voting." Id. at 916.

Here, the draft letter has as its first provision the following statement: "The Union affirms that it would be consistent with past practice within the Third Circuit in New Jersey for a CSO position within the Circuit to be filled first by building seniority where the opening occurs."

The draft letter presents the issue to be voted upon as a confirmation of past practice.  This clearly conflicts with the evidence at the trial, which revealed that no past practice had been established.  Specifically, there were no past situations that would have prompted the application of site seniority as a past practice, and witnesses held conflicting views of what the past practice actually was.

In addition, the Court is troubled by the difference in the way the Union conducted the vote in Camden and Trenton, as compared to Newark.  In Camden and Trenton, the votes were collected by union representatives who informed union members of the vote, were present for questions, and ensured that voting occurred before the poll was over.  In Newark, there was no union representative to serve these functions.  Evidence at trial showed that the union representatives neither coerced nor threatened voters to vote for or against the draft letter.  However, the Court is concerned that the active presence of the union representatives assisting with the votes at the polling locations raises the specter of influence, given the disparity in the voting turnout between the three work sites.  Significantly, even though CSOs in Newark were given an additional day to vote, many of them still did not vote.  Also, testimony from Newark CSOs indicated that there was confusion about the vote, and that at least one CSO desired more information about the seniority provision in the CBA.

After considering the Union's unsupported statements of its past practices to the union membership, combined with the inconsistent way the vote was presented and conducted between the three work sites, the Court finds that the Union deprived Plaintiff of a meaningful opportunity to vote.  See Carothers, 705 F. Supp. at 692 (finding that if a union provides "inadequate or misleading information about the matters to be voted upon," it has denied its membership the

right to a meaningful vote (quoting <u>Bunz</u>, 567 F.2d at 1121)).  Accordingly, the Court concludes that the Union has breached its duty of fair representation.

IV.   Conclusion

An appropriate remedy for a union's breach of its duty of fair representation must be tailored to the circumstances of each case.  <u>Vaca</u>, 386 U.S. at 195.  Because the union members were not fully and accurately informed as to the past tradition, the Court concludes that the vote was invalid.  Therefore, the Court will order the Union to hold a new vote, to be conducted in a manner consistent with the principles developed under decisional law.  In particular, the Union should fairly and accurately present the issue to be voted upon, and should provide the voters with a copy of the CBA provision that would be affected by the vote.  In addition, the Union should ensure that the vote is conducted in a uniform way in all three courthouses, by secret ballot or otherwise, and should specify a concrete and reasonable period of time during which the vote is to be held.

The Court does not issue any order regarding whether Plaintiff should be granted the full-time Camden CSO position.  The Court notes that any such order would be speculative at best, because the language of the CBA regarding seniority was ambiguous, and the evidence failed to establish either a past practice of site seniority or district-wide seniority.

An appropriate order of judgment will be entered pursuant to Fed. R. Civ. P. 58.

                                                        s/ Anne E. Thompson  
                                                      ANNE E. THOMPSON, U.S.D.J.

Dated: 3/13/06